**TOWNE v. McELLIGOTT, Acting Collector of Internal Revenue.**

(District Court, S. D. New York. August 5, 1921.)

1. **Constitutional law ⊗═286—Internal revenue ⊗═2—War tax, justified by practice of other nations, not confiscatory.**

   In determining whether a war tax is so excessive as to be confiscatory and void under the Fifth Amendment, it must be considered, in view of the current practices of other civilized nations, in the exercise of similar powers.

2. **Internal revenue ⊗═7—Income tax; measure of profit from sale of corporate stock.**

   In computing the profit from the sale of shares of corporate stock, for income tax purposes, where the seller has received a stock dividend on

⊗══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the shares sold, he is not to be considered as having sold all he bought, and is not entitled to credit for the full price paid, but only for the proportion of the price that the shares sold bear to the whole number accruing from the purchase.

3. **Internal revenue** ☞7—**Income tax; computing cost of stock dividend shares sold.**

Where a purchaser of stock of a corporation at different times and different prices received a stock dividend on all his shares, and sold a part of his dividend stock, in computing his profits for income tax purposes, the cost of such shares should be determined by allocating the dividend stock between his different purchases, and attributing the shares sold first to his first purchase, and so in order.

At Law. Action by Henry R. Towne against Richard J. McElligott, Acting Collector of Internal Revenue. On demurrer to complaint. Demurrer passed for computation.

See, also, 242 Fed. 702.

This case arises upon demurrer to a complaint by a taxpayer for money paid on income taxes. It raises two questions: First, whether the profits realized upon the sale of the plaintiff's shares of stock were correctly computed; second, whether a surtax of 72 per cent. on such profits was confiscatory. The first question depends upon these facts: The plaintiff owned shares in a corporation before March 1, 1913, and bought other shares thereafter. Later he received a stock dividend of 50 per cent. upon all his shares. In 1918 he sold some of his shares, including those certificates which he had held on March 1, 1913, those which he had bought later, and some of those which he had received as a stock dividend. The tax was collected on the following basis: The plaintiff was charged with the gross sale price and credited on each share sold with the average cost of all the shares. This average for each share was computed by dividing the gross cost of all such shares by the number of the shares, including the shares declared as a stock dividend. The plaintiff argues that he should be credited with the actual cost of each certificate, computing the cost of the shares declared as a stock dividend at nothing. Thus the difference between the parties is whether, in estimating the taxpayer's credit on each share sold, the stock dividend shares should be brought into hotchpot with the shares on which the stock dividend was declared.

Richard S. Holmes, of New York City, and Ferdinand Tannenbaum, for demurrant.

Louis H. Porter, of New York City, opposed.

LEARNED HAND, District Judge (after stating the facts as above). [1] I shall take up the second point first, since, if it were sound, it would dispose of the whole case. In brief it comes to this: That a tax of 72 per cent. on the last increment of the plaintiff's income, and a tax of 50 per cent. upon his whole income, is confiscatory, and, if so, void, under the Fifth Amendment. The term "confiscatory," when so used, is clearly one of degree, because literally all taxes are pro tanto confiscatory. Except as it imports some inequality of burden. not here suggested, it can mean nothing but that there is a measure to the amount which the government may seize in taxes for its own purposes. The plaintiff relies on certain language in Brushaber v. Union Pac. Ry., 240 U. S. 1, 24, 25, 36 Sup. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713, which, broken

from its context, he thinks helps his contention. The meaning of that language is only that there may be inequalities in the rates of levy great enough to become a confiscation of the income which suffered the highest rates. The Chief Justice identified possible confiscation with a tax "so wanting in basis for classification as to produce such a gross and patent inequality as to inevitably lead to the same conclusion"; i. e., the conclusion that the property was confiscated. I do not read this language as giving any color for arguing that, when the inequalities are lawful, the rates may be confiscatory as a whole, nor is there any such suggestion in the books that I have seen.

In fact, our war taxes are not out of relation to the sums levied by other civilized nations faced with the same exigencies as the Great War imposed upon us. In critical periods of a nation's life the power to tax may be necessary to preserve it, and perhaps there is no limit beyond which it may not subject the property within its reach to contribution. I need not go so far as that in this case; it is enough that the powers of Congress are to be interpreted, not by dialectical ingenuity, but by current practices of nations in the exercise of similar powers. It is true that these powers are limited, and that those limits must be observed, however little they circumscribe the analogous powers of other Legislatures. Yet when the question is of the interpretation of those broad counsels of moderation contained in the Fifth Amendment, we must interpret the limitations themselves with an eye to the practices which have become tolerated elsewhere among civilized nations. Were it not so, we should be limited forever to the political usages of 1789, and those amendments which were intended to protect the individual against extravagant or invidious discrimination would become a strait-jacket upon the nation's freedom.

[2] The second point is raised by Eisner v. Macomber, 252 U. S. 189, 40 Sup. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, and must be ruled by its implications. Under the doctrine of that case a stock dividend is not regarded as new property at all. The old certificate represented precisely the same property as the old and new do thereafter. The old shares have proliferated, as it were, and although the right they represented has now suffered a cellular division into smaller units of greater number, that is all that has happened. In view of this, it seems to me difficult to avoid regarding the old and new shares together as anything more than the evidence of a right which has persisted unchanged through the declaration of the dividend. It might have been possible to look at the new shares as declared from the surplus, and the surplus as not included in the old shares (at least not in the same sense as the new shares comprise it); but all such notions were expressly repudiated in the prevailing opinion. If so, each of the new shares, whether contained in the old or the new certificate, represents a part of the original property purchased and in selling the first certificate the stockholder has not sold the whole of what he originally bought, and should not be credited with the whole purchase price. Judge Rose, in Safe Deposit, etc., Co. v. Miles (D. C.) 273 Fed. 822, has adopted the same theory of computing an income tax in a stronger case. There the plaintiff sold some "rights" declared

upon his stock, and Judge Rose computed his profit in substantially the same way as I suggest here.

[3] The plaintiff answers this argument by saying that, if so, all shares at any time held by a stockholder must be brought into hotch-pot and averaged. I scarcely think that consistency requires me to go so far. The law may, and in fact does, recognize an identity in every share, which can indeed be traced upon the books of the company, at least until certificates are consolidated, and later subdivided. The purchase of a number of shares can be earmarked by the certificate, and it is an enormous convenience to keep the purchases separate. Yet it is possible and consistent, when new shares are declared, to atttribute them ratably in subdivision of those already issued. They, are not so entered on the books, it is true; but the books are not kept in accordance with the underlying doctrine of Eisner v. Macomber, supra, in any event. At least the earlier certificates need not lose their separate identity because new shares are filiated to them in proper proportion.

An illustration will make clear what I mean. Suppose a man has certificate A, for 100 shares, bought at $100, certificate B, for 100, bought at $150, and certificate C, for 100, bought at $200. Suppose, further, that a stock dividend of 50 per cent. is declared, and he gets one certificate D, for 150 shares, without paying anything. If he sells certificate A, he would be deemed to sell, not the whole of his first purchase, but only two-thirds of it, and he could credit himself with only $6,666. If he sold certificate B, he would credit himself with $10,000, and if certificate C with $13,333. If he sold certificate D, he could credit himself with $15,000, made up of $3,333 from his first purchase, $5,000 from his second, and $6,666 from his third. If, on the other hand, he sold only a part of certificate D, some arbitrary rule of apportionment must be adopted, allocating the shares sold among his purchases. The most natural analogy is with payment upon an open account, where the law has always allocated the earlier payments to the earlier debts, in the absence of a contrary intention. Accordingly, if all the new shares were not sold at once, I think the first sales should be attributed to the first purchases still remaining unsold when the stock dividend was declared. I do not see that this method will result in confusion in its application, and it carries into effect the underlying theory of Eisner v. Macomber, supra.

The tax at bar was not computed quite in this way, because all the purchases before the declaration of the stock dividend were brought into hotch-pot. This I think was inconsistent with the theory of the identity of the shares involved in each purchase. It must, therefore, be recalculated, which the parties have kindly consented to do, if they are told the rule. The credits will be computed as follows: Upon each certificate held on March 1, 1913, two-thirds its value on that day; i. e., $230. Upon each certificate bought at $100, $66⅔. Upon each certificate for stock dividend shares, if issued against any specified earlier certificate, the same credit per share as the shares of that certificate. If the certificate of new shares is not so earmarked, or if but one certificate was issued for the new shares, then credit will

be allowed of two-thirds the value of the shares on March 1, 1913, until half the number of shares have been sold, which the plaintiff held on March 1, 1913, and retained till the stock dividend.

The formal disposition of the demurrer will depend upon this calculation. If the tax is less than that collected, the demurrer will be overruled, and the plaintiff will take judgment for the difference; if it is greater, or the same, the demurrer will be sustained, and the complaint dismissed, with costs.

3. Patents ⬭118—Evidence held to show defects in disclosure rendering machine inoperable.
   In a suit for infringement of a patent, evidence *held* to show that there were such defects in the machine disclosed by the patent as rendered it inoperable.

4. Patents ⬭118—Evidence held not to show defects could be overcome by mechanic.
   In a suit for infringement of a patent, evidence *held* to show that the defects in the construction of the machine as disclosed by the patent were such as could not be overcome by a skilled mechanic.

5. Patents ⬭129—Patentee cannot claim improvement covered by subsequent patent was mechanical only.
   A patentee, who had received a subsequent patent covering improvements in the machine covered by the earlier patent, cannot claim that such improvements were merely mechanical and did not involve invention, and therefore cannot claim that a machine constructed under the later patent established that the disclosure in the earlier patent possessed only such defects as a skilled mechanic could overcome.

6. Patents ⬭118—Evidence held not to show operation of machine constructed under patent.
   In a suit for infringement of a patent where the defense was that the patent did not disclose an operable machine, evidence *held* not to show that machines which had been actually operated were constructed under the patent in suit.

7. Patents ⬭91(4)—Evidence held not to show that subsequent patentee had taken prior patentee's idea.
   In a suit for infringement of a patent, where the defense was that the disclosure in the patent was not operable, evidence *held* not to es-

---

⬭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes