**HEWES et ux. v. EATON, Collector of Internal Revenue.**

No. 3332.

District Court, D. Connecticut.

March 12, 1930.

Robinson, Robinson & Cole, of Hartford, Conn., for plaintiffs.

John Buckley, U. S. Atty., and George H. Cohen, Asst. U. S. Atty., both of Hartford, Conn., for defendant.

THOMAS, District Judge.

This matter is here on defendant's demurrer to the complaint which sets forth the usual taxpayer's action to recover income taxes alleged to have been illegally assessed and paid under protest. The procedure adopted by the defendant in filing a demurrer to the complaint follows the course adopted and apparently approved in Towne v. McElligott (D. C.) 274 F. 960, so that the question presented is whether the Commissioner of Internal Revenue was authorized by law to apply to the facts the provisions of article 39, Reg. 62, as amended by Treasury Decision 3403.

The income tax return for the calendar year 1922, filed by Thomas Hewes, was a joint return with his wife, Genevieve Chase Hewes, and in this joint return was set up the taxable income of both persons.

In August, 1913, Mrs. Hewes received as a gift, under a deed of trust executed by her father in 1909, 200 shares of the capital stock of the Hartford Fire Insurance Company. It is alleged by the plaintiffs and conceded by the defendant that this stock, at the time it was received, had a value of $695

per share. In the year 1919, the company issued to its shareholders the right to subscribe for one new share of its stock for each share then held, at a cost of $150 per share. Mrs. Hewes exercised this right to subscribe and acquired 200 new shares for which she paid $30,000. In February, 1922, she sold 125 shares of the original 200 shares acquired in August, 1913, at approximately $571 per share, making delivery from the original certificate of stock. It is alleged in the complaint and reported in the joint return that, by reason thereof, she suffered a loss of $124 a share or $15,500, on the theory that the value of the stock in 1913 was $695 and the sale price in 1922 was $571—and the difference represented the loss per share. The amended complaint, after averring that the net loss was $15,500, then alleges that the net income for 1922 from all other sources was $12,402.66 so that there was a net deficit for that year of $2,869.85, resulting in no tax due.

Thereafter, the return of the plaintiffs having been audited by the Treasury Department, a tax of $2,894.35, with interest, was assessed against the plaintiffs for the year 1922, and after the usual routine, the same was finally paid under protest. The complaint further alleges that the government determined that the correct value of the stock sold, as of 1913, was $422.50 per share instead of $695 per share, which value was arrived at by adding to the value of the original 200 hundred shares, viz.: $139,000, the cost of the new 200 shares, viz.: $30,000, resulting in a total cost for the 400 shares of $169,000, or an average cost of $422.50 per share. Therefore, when the stock was sold for $571 per share, the difference between $571 and $422.50 constituted the profit per share and upon this basis the Commissioner assessed the tax.

On the briefs of counsel the question is treated as one of law and it is assumed that there is no dispute as to the facts. It is further assumed that the only question is whether the Commissioner of Internal Revenue applied a correct theory of valuation. It would, perhaps, have been more appropriate to bring this question up on a stipulation setting out an agreed statement of facts. This reflection is prompted by the somewhat altered position taken by the plaintiffs in their amended complaint. In their original complaint they demanded the return of the entire sum assessed against them. In their amended complaint they offer the suggestion that if they are not entitled to the entire sum, they are, at least, entitled to a diminution of the tax upon an application of a modified theory of averages, and not of the theory adopted and applied in the instant case. However, as the matter arises upon demurrer, I shall determine whether upon the facts presented by the plaintiffs, the Commissioner of Internal Revenue was justified in his methodology, and, if so, that disposes of the issues before me.

The instant tax was imposed under the provisions of the Revenue Act of 1921 (42 Stat. 227). Section 202 of that act provided that where *property* was acquired by gift on or before December 31, 1920, and was subsequently sold, then the basis for ascertaining a gain shall be "the fair market price or value of such *property* at the time of such acquisition." As already noted, it is conceded that the fair market value of the stock acquired by Mrs. Hewes at the time of its acquisition by her was $695 per share. She contends, therefore, that if she sold any part of this stock for less than $695 per share she must, perforce of the definition of the statute, have suffered a loss.

Regardless of the cases to which we will hereafter advert, it seems to me that the vice of this reasoning lies in the identification of the concept of *shares* with that of *property*. The statute does not speak of the value of *shares* acquired by gift, but it speaks of the value of *property* acquired by gift. Property, depending upon its nature and form, of course, may be infinitely divisible. It may be divided, we will say, into 30 shares at one time and into 60 shares at a later time; but the 30 shares of earlier date will comprise no more in their total value than the 60 shares of the later date. If a part of the property is sold, then the question is, what relation does the part sold bear to the whole of the property acquired; not how many shares or subdivisions are there in the property.

As an example let us assume the acquisition by some one, either by purchase or gift (and it is immaterial which), of a plot of ground which, at the time of acquisition was divided into 20 equal lots, each having a present value of $5,000. Let us next assume that the taxpayer subdivides the same property into 40 lots and then sells one of these lots for $4,000. Let us further assume that these lots are all of equal value and of the same size. Could it then be argued that inasmuch as a lot was originally worth $5,000 on the date of its acquisition and because a lot was sold for $4,000, that therefore the taxpayer suffered a loss of $1,000 upon such sale? So, when a corporation, instead of distributing its surplus in cash to its shareholders, increases its capitalization and distributes

shares of stock representing such increase of capitalization to its shareholders, it does nothing more than subdivide lots. Of necessity there must ensue a drop in the market price of each separate share of stock, but such a share no longer represents the same fraction of the total issued capital stock that it formerly did. A shareholder does not suffer by this decrease in the value of undivided shares because the apparent loss in the value of the old stock is counterbalanced by the accretion thereto of the value of the new stock. If, therefore, a stockholder sells all of the original issue of stock, but retains all of the new issue, he, in effect, sells only part of the stock which had been originally acquired by him; he does not sell all of it. To say, however, that this sale of a part results in a loss, because each share of stock in that part sells at a price lower than the price at which the larger original share was bought, is to adopt a fiction as the basis of determining a tax.

When the taxpayer in the instant case sold 125 shares of the total number of shares held by her, she sold five-sixteenths of the *property* which she had acquired by gift and not five-eighths thereof. In the absence of other circumstances the basis, then, of determining whether or not she incurred a gain or loss, is to determine the total value of the stock acquired by gift, and then take five-sixteenths thereof. If the total amount realized from the sale of five-sixteenths was larger than five-sixteenths of the value prior to 1920, then a gain resulted and not a loss.

But into the acquisition of this additional 200 shares of stock a new cost element supervened. The additional 200 shares were not issued purely by way of stock dividend. An additional $30,000 was invested in order to secure these shares. This $30,000 must therefore be added to the $139,000 of original value, not because the original value is to be determined by expenditures made years later, but because it is a simple way of working out the accounting problem, for, properly speaking, this $30,000 was in the nature of an expense for maintenance. Had it not been expended, then the taxpayer would not have been able to acquire the additional 200 shares and the result would be that the taxpayer would then in real earnest have suffered a loss of almost half the value of this stock. The right to buy 200 additional shares at $150 per share, while appearing in the guise of a privilege was, in reality, an imperative, for if the so-called privilege was not exercised and others availed themselves of the right to purchase the new stock at the price given, then the taxpayer's holdings would have suffered serious depreciation in value.

Therefore the Commissioner of Internal Revenue was right in adding $30,000 to the original value of $139,000 as the total value of the stock, and then dividing this sum by 400, the total number of shares, in order to arrive at the original value of a single share of stock in the form in which it is now held. His action is, I think, sustained by the logic of the situation as well as by the authority of Miles v. Safe Deposit Co., 259 U. S. 247, 42 S. Ct. 483, 66 L. Ed. 923; Ayer v. Blair, 58 App. D. C. 110, 25 F.(2d) 534 and Towne v. McElligott, supra.

For the reasons herein stated, the demurrer is sustained, and it is so ordered.