WESTERN BANK & TRUST CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28542, 29180, 39948. Promulgated March 26, 1930.

*H. B. McCawley, Esq.*, and *Robert E. Lynch, Esq.*, for the petitioner.

*R. W. Wilson, Esq.*, for the respondent.

404

MORRIS: The first question is the basis to be used in determining gain or loss resulting from sales of Ann Arbor Railroad Co. stock in 1922 and 1925. The petitioner contends that it acquired all the railroad stock and held the same as an investment; that as to the 625 shares of preferred acquired in 1908, the basis should be the fair market value on March 1, 1913, and that as to the remaining shares of stock, both preferred and common, the basis should be cost. The respondent contends that petitioner was at all times a licensed dealer in securities; that such securities were properly and consistently inventoried at market, and that the inventory method is the proper basis for computing gain or loss on the sale of any or all of said stocks.

The sections of the Revenue Act involved in determining this question as to the preferred stock are sections 202 and 203 of the Revenue Act of 1921. Section 202 provides in part as follows:

(a) That the basis for ascertaining the gain derived or loss sustained from a sale or other disposition of property, real, personal, or mixed, acquired after February 28, 1913, shall be the cost of such property; except that—

(1) In the case of such property, which should be included in the inventory, the basis shall be the last inventory value thereof;

\* \* \* \* \* \* \*

(b) The basis for ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, acquired before March 1, 1913, shall be the same as that provided by subdivision (a); but—

\* \* \* \* \* \* \*

(2) If its fair market price or value as of March 1, 1913, is lower than such basis, the deductible loss is the excess of the fair market price or value as of March 1, 1913, over the amount realized therefor;

Section 203 provides:

That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

In Regulations 62, relating to the Revenue Act of 1921, the respondent has interpreted section 203 with particular reference to inventories by dealers in securities as follows:

ART. 1585. *Inventories by dealers in securities.*—A dealer in securities, who in his books of account regularly inventories unsold securities on hand either (a) at cost or (b) at cost or market, whichever is lower, or (c) at market value, may make his return upon the basis upon which his accounts are kept; provided that a description of the method employed shall be included in or attached to the return, that all these securities must be inventoried by the same method, and that such method must be adhered to in subsequent years, unless

another be authorized by the Commissioner. For the purpose of this rule a dealer in securities is a merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom. If such business is simply a branch of the activities carried on by such person, the securities inventoried as here provided may include only those held for purposes of resale and not for investment. Taxpayers who buy and sell or hold securities for investment or speculation, and not in the course of an established business * * * are not dealers in securities within the meaning of this rule. * * *

The basis for determining gain or loss with respect to the sale of the common stock in 1925 is set out in section 204(a) of the Revenue Act of 1924, which states that "the basis for determining gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property * * *."

In view of the provisions of the Revenue Acts and the regulations with respect thereto, it is important to determine whether the notes and the stocks received therefor were acquired by the bank for resale or as an investment.

With respect to that question, in view of the already very lengthy statement of facts, it would seem only necessary to repeat here the salient factors inducing us to the belief that these securities were in fact held for investment and not for sale to its customers. The record shows that the bank purchased only Federal, State, county, municipal, and public utility bonds for sale to its customers, except in one or two isolated instances. We are satisfied, certainly, that it was not the general practice of the bank to deal in corporate stocks. We are constrained to the belief that the purchase was somewhat influenced because of the dual relationship occupied by Leopold Kleybolte with the bank and his brokerage interest, and because of this relationship we feel certain that the bank would not have purchased the original notes for sale in competition with Kleybolte's brokerage interests. Furthermore, the notes were for a very short term and consequently offered very little inducement to the average investor. The record shows that the notes were carried in the books of account of the bank as an asset, that they were never offered for sale, and that they were carried separately and in an entirely different manner from which securities held for resale to customers were handled. From 1911 until the dissolution of the Ann Arbor Co. in 1916 the stocks of that company received in exchange for notes surrendered thereto were carried on the books of the bank as an asset, while other securities, as we have already explained, were carried in a separate account and inventoried from time to time in order to determine profits or losses. The record is emphatic, and we have found as a fact, that neither the stocks of

the Ann Arbor Co. nor the notes of the Detroit, Toledo & Ironton Railway Co. were ever offered for sale by the bank throughout the period 1911 to 1916. Upon dissolution of the said Ann Arbor Co. the bank received the stocks here in question of the Ann Arbor Railroad Co. and the record shows also that those stocks were carried as an investment among the bank's assets. It is true that certain evidence was offered by the respondent to minimize the value of the testimony given by the petitioner's witnesses, but that evidence was satisfactorily overcome by the petitioner. Considering these factors and all of the other facts and circumstances set forth in the findings of fact herein, and in the recorded testimony of witnesses, we are of the opinion that with respect to the securities in controversy the petitioner was not a dealer as the respondent contends, and, therefore, they should not be inventoried as in the case of securities purchased for resale.

Therefore, since the inventory method is inapplicable to the securties in question, we must determine and prescribe the bases to be applied to the 625 shares of preferred stock of the Ann Arbor Railroad Co. acquired in 1908, and the remaining shares acquired in 1916 upon dissolution of the Ann Arbor Co.

The 625 shares of Ann Arbor Railroad Co. stock were acquired in 1908, by reason of the default of Rudolph Kleybolte & Co. upon certain loans, at a cost to the bank of not less than $62,500, the par value of said stock being $100 per share. Evidence with respect to the March 1, 1913, value of the said stock was presented of the bid and asked prices on that date as found in the Commercial and Financial Chronicle, which showed that there was bid 15, and asked 30, for the common stock, and bid 50, and asked 80, for the preferred stock. In *Ralph Andrew Applegate*, 10 B. T. A. 705, where the March 1, 1913, value was in controversy, the Board had before it similar evidence as to the March 1, 1913, value; that is, the bid and asked prices on the New York Stock Exchange. We held there that the respondent was not warranted in taking the lower of the two figures as the fair market value, nor the petitioner the higher figure, but that an average of the two prices more nearly represented and should be taken as the fair market value as of March 1, 1913. For the purpose of determining the March 1, 1913, value of the said 625 shares, we are of the opinion that an average of the bid and asked prices, to wit, $65 per share, should be used. Since the fair market value on March 1, 1913, was lower than cost, the March 1, 1913, value should be adopted as the basis for determining the loss, which will be the difference between said value and the amount realized therefor. The block of 625 shares of preferred stock was not segregated and identified separately from the remaining shares sold in 1922 and 1923. However, in the absence of evidence segregating and

identifying those shares, they, being the first acquired by the bank, will be deemed to have been included with the 4,443 shares sold in 1922. See *George W. Megeath et al.*, 5 B. T. A. 1274; *Towne* v. *Mc-Elligott*, 274 Fed. 960, 963; *David Stewart*, 17 B. T. A. 604. Also, see article 39, Regulations 62, as amended by T. D. 3403.

The basis applicable to the remaining shares of the Ann Arbor Railroad preferred sold in 1922 will depend upon when they were " acquired " within the meaning of the Act; that is, whether they were acquired prior to February 28, 1913, or subsequently thereto. The facts of record, briefly restated, are that the bank originally became the owner of collateral trust notes of the Detroit, Toledo & Ironton Railway Co., which said company defaulted in the payment thereon in 1908, whereupon the noteholders, of which the petitioner was one, formed a committee, under a noteholders' agreement dated February 3, 1908, as amended February 20, 1908, providing for the deposit in trust of the said notes, and for the receipt therefor in the form of certificates of deposit. Under the terms of that agreement the committee was made trustee of an express trust, with legal title to all the notes and coupons so deposited. The bank accordingly deposited its notes with the depositary, receiving certificates of deposit in three separate sums of $482,000, $56,000, and $50,000 in 1910. The general mortgage of the Detroit, Toledo & Ironton Railway Co. was foreclosed and in November, 1910, representatives of the committee purchased the 30,100 and 21,900 shares of preferred and common stocks, respectively, of the Ann Arbor Railroad Co. In 1911 it was decided to form a holding company to hold the securities then held by the committee, and the Ann Arbor Co. was incorporated for the express purpose of acquiring the stocks of the Ann Arbor Railroad Co. and for no other purpose, and thereupon the noteholders received their proportionate share of stock of the Ann Arbor Co. Thus, the petitioner first owned collateral trust notes of the Detroit, Toledo & Ironton Railway Co.; thereafter, certificates of deposit representing said notes deposited with the committee; and then, finally, corporate shares of the Ann Arbor Co., the latter of which it held until the dissolution of the said Ann Arbor Co. in 1916, when it surrendered its shares in that company for the shares of stock of the Ann Arbor Railroad Co., together with a portion of the bonds of the Detroit, Toledo & Ironton Railway Co. Under this state of facts it is difficult to see how it can be logically said that the petitioner received stock of the Ann Arbor Railroad Co., other than the 625 shares hereinabove disposed of, prior to 1916, when the Ann Arbor Co. dissolved. We are of the opinion, therefore, that the cost in 1916 should be adopted as the basis for computing the gain or loss upon the shares so acquired. Since the shares of the Ann Arbor Railroad Co. were acquired for shares of the Ann Arbor

Co. the fair market value of the shares received will be adopted as cost, which we have found to be $65 a share for the preferred and $25 a share for the common.

The second issue involves the deductibility of certain amounts that were charged off in 1924, 1925, and 1926. Petitioner alleges that these amounts were ascertained to be worthless in the year charged off and that, therefore, the deductions should be allowed under section 234 (a) (5) of the Revenue Acts of 1924 and 1926. The provisions of this section in the two Acts are identical and read as follows:

SEC. 234. (a) In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\* \* \* \* \* \* \*

(5) Debts ascertained to be worthless and charged off within the taxable year (or in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts) ; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part.

While the respondent concedes that the amounts in question have been charged off by the petitioner, the section of the statute aforesaid only requires that we be satisfied that the debt is recoverable only in part, and, if so, it may be charged off in part.

In the first place the Marmet Coal Co. had been indebted to the petitioner for a great number of years, reducing its indebtedness from time to time, but never being entirely out of its debt. It issued bonds in order to raise funds with which to conduct its business, but was unable to pay even the interest on said bonds and it was compelled to go into the hands of a receiver, who operated the properties at a loss, and they were, therefore, put up for sale. The petitioner, being the only bidder, acquired the mine for $100,000, and the Cincinnati property for $35,000, in order that it might place Marmet in charge with the hope that he would ultimately straighten out its financial difficulties. The properties were thereupon deeded to Marmet for $70,000 in cash and $280,000 in notes, being approximately the indebtedness to the bank. Marmet paid the first note of · $50,000 and also $6,900 of interest on the remaining notes up to June 19, 1921. No further payments were made thereafter either on the principal or interest. The record shows that Marmet operated the properties at a loss up until the latter part of 1921 and that he was forced to borrow further sums of money at the bank to meet his obligations, and that it was because of the fact that his creditors were threatening to press their claims to judgment and levy execution upon the properties—something which the petitioner wished to avoid, because it realized that it would be compelled to bid the property in itself, that it advanced said sums of money to him.

The whole record abounds with evidence of a thoroughly unprofitable and unstable business enterprise, with a record for such insta-

bility dating back over a period of many years. But the question may very properly be asked, why, in view of these conditions, known to the petitioner and its officers, did it continue to advance funds during the very period of time when it is claiming a deduction for amounts which it contends are worthless and uncollectible? We believe this question has been satisfactorily answered by the petitioner's witnesses. It was the ever present and eternal hope of success and recovery of a great portion, if not all, of the indebtedness which spurred the petitioner on and caused it to make further advancements to Marmet and his company. As we view the matter from the record, it was a case of helping Marmet and his company financially or allowing Marmet's creditors to levy execution upon the properties of the company and compel the petitioner, in order to protect its own interest in the matter, to bid the property in at a public sale. This, as we have already said, was something which the petitioner very carefully attempted to avoid.

Realizing the deplorable state of affairs, the petitioner's officers visited the mining properties of the Marmet Coal Co. and investigated the condition of the mine and equipment and the prospects of disposing thereof. They found that in 1924 the equipment was rusty and obsolete, that water was in the mine, and that the condition generally was not very good. Petitioner offered to sell the properties upon a number of occasions, but was unsuccessful. It offered its claim to Marmet for 50 cents on the dollar, but, since Marmet's only asset was his interest in the mining property, he was unable to negotiate the purchase.

Taking into consideration the past history of Marmet and his company, the amount of the indebtedness, the then state of affairs and the fact that Marmet had been unable to even pay the interest upon his indebtedness, the petitioner's officers decided upon what they regarded as a fair amount that should be written off during each of the three years 1924, 1925, and 1926. In 1924 it deducted $18,000 on account of the principal of said indebtedness, and $4,153.44 of interest which it had accrued on its books of account but which it had not received; in 1925 it deducted $60,000 on account of the principal, and $13,000 of interest which it had accrued but had not received; and in 1926 it deducted $27,919.85, all of which said amounts the respondent has disallowed.

Considering all of the factors which we have discussed at some length and the testimony of witnesses of record, we are of the opinion that the respondent was in error and that the deductions should be allowed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*