SAN CARLOS MILLING COMPANY, LIMITED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39525.   Promulgated December 11, 1931.

*George E. Cleary, Esq.,* and *George S. Herr, Esq.,* for the petitioner.

*John D. Foley, Esq.,* for the respondent.

1136

OPINION.

SMITH: In so far as material hereto, section 262 of the Revenue Act of 1921 provides:

(a) That in the case of citizens of the United States or domestic corporations, satisfying the following conditions, gross income means only gross income from sources within the United States—

(1) If 80 per centum or more of the gross income of such citizen or domestic corporation (computed without the benefit of this section) for the three-year period immediately preceding the close of the taxable year (or for such part of such period immediately preceding the close of such taxable year as may

be applicable) was derived from sources within a possession of the United States; and

(2) If, in the case of such corporation, 50 per centum or more of its gross income (computed without the benefit of this section) for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States; or

\*   .   \*       \*       \*       \*       \*       \*

(b) Notwithstanding the provisions of subdivision (a) there shall be included in gross income all amounts received by such citizens or corporations within the United States, whether derived from sources within or without the United States.

The petitioner contends that the sugar received by it under its milling contracts was received in payment for services rendered in manufacturing the planters' cane into sugar, and that the sugar so received constituted income received in a possession of the United States, to the extent of the fair market value of the sugar at the time of its receipt. The respondent contends that the transaction between the planters and the petitioner amounted to a sale of the cane to the petitioner and that the cost of the sugar was the expense of operating its mill; that the petitioner did not realize income in the Philippines upon production of the sugar, but that income was realized only upon sale of the sugar.

On brief, the petitioner argues that the transaction amounted to a bailment, and the respondent argues that it " amounted to a purchase of cane by petitioner," or a sale. In *Sturm* v. *Boker*, 150 U. S. 312, 329 (cited by both parties) the Supreme Court stated that:

\*   \*   \* The recognized distinction between bailment and sale is that when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed; the transaction is a sale. \*   \*   \*

The milling contract provided that the cane was to be manufactured into sugar and 60 per cent of the product (that is, the cane in an altered form) returned to the planter. There is nothing in the contract to show that the petitioner was " at liberty to return another thing of value," and the record indicates that the planter's sugar, less the petitioner's commission, was returned to him; at no time did the petitioner sell for its own account the sugar so produced and pay the planter money instead of returning to him his share of the sugar.

In *Sturm* v. *Boker, supra*, and other cases involving the question of bailment or sale, the courts have sought to effectuate the intent of the parties as expressed in their agreements. See *Powder Co.* v. *Burkhardt*, 97 U. S. 110; *Arnold* v. *Hatch*, 177 U. S. 276; *Ludvigh* v. *American Woolen Co.*, 231 U. S. 522; *In re Taylor*, 46 Fed. (2d) 326; *In re Renfro-Wadenstein*, 47 Fed. (2d) 238.

In *Arnold* v. *Hatch, supra,* the Supreme Court said:

We do not know that it is necessary to fix an exact definition to the relations between these parties, or to determine whether the law of master and servant, landlord and tenant, or bailor and bailee, governed the transaction. The main object is to ascertain the intent of the parties with respect to the ownership of the property. * * *

*    *    *    *    *    *    *

It is very evident * * * that no sale of the * * * property was intended. There was no purchase price agreed upon, no time fixed for the payment. * * *

The milling contracts provided that the petitioner "will charge and accept as full compensation for the services rendered and agreed to be rendered hereunder 40% of the sugar" and that the planter "will allow the mill [petitioner], and it may and shall retain, as its share or proportion of the sugar, and as full compensation for its services rendered hereunder * * * forty per cent. (40%) of all the sugar * * * produced."

The record supports the intent of the parties, as expressed in the contract, to compensate the petitioner for milling the cane into sugar by allowing the petitioner to retain 40 per cent of the sugar produced. During all of the years with which we are concerned the petitioner and the planters so construed their contracts and acted accordingly. As the petitioner points out on brief, "It is significant that nowhere in the contracts are the terms 'sale,' 'purchase,' 'selling price' or 'purchase price' used, and that many of the provisions are inconsistent with an agreement of sale" of the cane to the petitioner as contended by the respondent. The provisions for weighing and crushing the planter's cane, the computation and delivery of the percentage of sugar manufactured from his cane, and the storage of such sugar at the planter's risk, all negative the idea of a sale of the cane to the petitioner. The plain language of the contracts and the action of the parties show that these were milling contracts for the manufacture of sugar by the petitioner from the planter's cane and that the petitioner was to have a toll or share of the sugar manufactured as compensation for its services. Such provisions would have been wholly unnecessary had the parties to those contracts contemplated a sale of the cane to the petitioner.

Although we do not consider it necessary to decide the legal relationship between the petitioner and the planters, we believe that the transaction contained elements of bailment and lacked elements of sale. See *In re Renfro-Wadenstein, supra.* The respondent makes much of the fact that the juices from each planter's cane were commingled with other juices, and that the sugar produced was in a common mass. Such facts, in some circumstances, might support

a sale of the raw material or the goods commingled, but where the commingling was by the consent of the owner, as in the instant case, such owner " becomes the owner as tenant in common of an interest in the mass proportionate to his contribution." *Intermingled Cotton Cases*, 92 U. S. 651, 653. See also Williston on Sales, vol. 1, secs. 153 and 154, wherein the commingling of grain in the *Elevator Cases* is discussed.

The manner in which the planters or their representatives followed the processes through which the petitioner produced the sugar from the planters' cane, the handling of the manufactured sugar in the petitioner's warehouse, the issuance of warehouse receipts for the planters' share of the sugar, and the fact that petitioner always had on hand sufficient sugar to cover outstanding warehouse receipts, show that title to the cane and its produce remained in the planters. By agreement the planters consented to the commingling of the juices from their cane—a necessary incident to the commercial milling of sugar, and further consented to the storage of the manufactured sugar *en masse* in the petitioner's warehouse, their ownership of their proportionate share thereof being evidenced by warehouse receipts. As pointed out above, this commingling was not fatal to the planters' ownership of a proportionate part of the sugar. Thus, the practical interpretation of the agreement by the parties thereto, as evidenced by their actions thereunder, supports the petitioner's contention that the sugar it received was compensation for its milling services rendered in the Phillippine Islands, a possession of the United States. The petitioner realized income at the time and place the sugar was received to the extent of its fair market value. (Section 213 (a) of the Revenue Act of 1921 and article 33 of Regulations 62.)

The amount of sugar received by the petitioner being stipulated, there remains the question of its fair market value on the several dates when received. There was an established market for 96-degree centrifugal sugar in the Philippine Islands and the record shows that petitioner sold some of its sugar there. We have before us quotations of prices on actual sales of sugar on or about the dates that petitioner received the sugar for its milling services. In the circumstances, we hold that the average quoted price on a given date is the fair market value of the sugar received by the petitioner on or about that date. Cf. *Ralph Andrew Applegate, Executor*, 10 B. T. A. 705; *Western Bank & Trust Co.*, 19 B. T. A. 401.

Upon the sale of sugar in the United States the petitioner received income from sources within the United States, even though the sugar was manufactured in the Philippine Islands. See *Porto Rico Consolidated Fruit Co.*, 16 B. T. A. 778, and cases there cited. The

amount of that income is the gain derived upon the sale, and not the total amount of the sale price received for the sugar. The cost basis of the sugar received as compensation for services rendered in the Philippine Islands and sold within the United States is the fair market value of that sugar at the time received (cf. *W. R. Jacques*, 5 B. T. A. 56; *J. Heninger*, 9 B. T. A. 1318; *William T. Bivin*, 21 B. T. A. 1051), to which should be added the expenses incurred by the petitioner in forwarding the sugar to the United States, since the sales were made upon the basis of a price in the United States.

In order to satisfy the requirements of section 262, the petitioner must show, *first*, that 80 per cent or more of its gross income for the three-year period immediately preceding the close of the taxable year was derived from sources within a possession of the United States; and, *second*, that 50 per cent of its gross income for such period was derived from the active conduct of a trade or business within a possession of the United States. See *John W. Haussermann*, 23 B. T. A. 378. The petitioner actively conducted the trade or business of manufacturing and selling sugar and operating a general merchandise store or commissary in the Philippine Islands, a possession of the United States, during the period prescribed by the statute. The parties have stipulated the figures necessary to a computation of petitioner's gross income, from which, and in accordance with our holdings above, we make the following summary of the petitioner's gross income:

| Year | Total | Amount received from sources within the Philippine Islands | Amount received from sources within the United States | Amount received from active conduct of a trade or business within Philippine Islands |
|---|---|---|---|---|
| 1921 | $662, 003. 98 | $646, 542. 57 | $15, 461. 41 | $604, 113. 02 |
| 1922 | 722, 467. 415 | 491, 073. 175 | 231, 394. 24 | 470, 007. 50 |
| 1923 | 794, 516. 525 | 719, 730. 895 | 74, 785. 63 | 689, 403. 16 |
| Total | 2, 178, 987. 92 | 1, 857, 346. 04 | 321, 641. 28 | 1, 763, 523. 68 |

Per cent of gross income received from sources within the Philippine Islands_____ 85. 2

Per cent of gross income received from the active conduct of a trade or business in the Philippine Islands_____ 80. 9

The petitioner fully meets the requirements of the statute and is entitled to the benefit of section 262 in computing its income for the taxable year 1923.

The second issue makes it necessary to determine whether petitioner sustained a net loss for the taxable year 1921, a portion of which it seeks to deduct from its net income for the taxable year 1923

under section 204 (b) of the Revenue Act of 1921. A summarized computation of petitioner's gross income (based on the stipulated figures) for the three-year period immediately preceding the close of the taxable year 1921, shows that it meets the requirements of section 262 for that taxable year. The computation follows:

| Year | Total | Amount received from sources within the Philippine Islands | Amount received from sources within the United States | Amount received from active conduct of a trade or business within Philippine Islands |
|---|---|---|---|---|
| 1919 | $702, 817. 615 | $643, 087. 265 | $59, 730. 35 | $574, 749. 74 |
| 1920 | 2, 576, 897. 485 | 2, 481, 522. 445 | 95, 375. 04 | 2, 330, 937. 39 |
| 1921 | 662, 003. 98 | 646, 542. 57 | 15, 461. 41 | 604, 113. 02 |
| Total | 3, 941, 719. 08 | 3, 771, 152. 28 | 170, 566. 80 | 3, 509, 800. 15 |

Per cent of gross income received from sources within the Philippine Islands_____ 95. 6
Per cent of gross income received from the active conduct of a trade or business in the Philippine Islands_____ 89

As defined in section 262 (a), the petitioner's gross income for the taxable year 1921 "means only gross income from sources within the United States." The amount of its gross income for that taxable year from such sources (exclusive of sales of sugar) is $15,461.41. Its net income, if any, for that year is determined in accordance with sections 232, 234 (b), and 217 of the Revenue Act of 1921. From the stipulated facts and figures we find that the petitioner sustained a loss of $695,387.53 upon its sugar sales within the United States and that its expenses incident to its business within the United States amounted to $43,543.63, making total allowable deductions of $738,-931.16 for the taxable year 1921. It is obvious that the petitioner sustained a net loss of $723,469.75 from the operation of its trade or business regularly carried on within the United States in the taxable year 1921 (section 204 (a), Revenue Act of 1921) and that under section 204 (b) the amount of this net loss is deductible from petitioner's net income for the taxable years 1922 and 1923. Since the sum of petitioner's gross income from sources within the United States for these years (1922 and 1923) is less than the amount of its net loss for 1921, it is apparent that the petitioner had no taxable net income for the taxable year 1923.

Since we have decided that the petitioner is entitled to the benefit of section 262 and that it sustained a net loss in 1921, a portion of which extinguishes its taxable net income for 1923, it is unnecessary to discuss the third issue.

From the above it is apparent that the petitioner had no tax liability for the taxable year 1923. From the record it appears that

for this year an income tax in the amount of $5,628.25 was assessed by the respondent and paid by the petitioner prior to the determination of the asserted deficiency. The petitioner's claim for the refund of this amount having been rejected by the respondent, the same should now be credited or refunded to the petitioner in accordance with section 284 (e) of the Revenue Act of 1926, as amended by section 507 of the Revenue Act of 1928.

> *Judgment will be entered of no deficiency for 1923 and of an overpayment in income tax for 1923 of $5,628.25.*