*1319 OPINION.
Van Fossan :
The respondent contends that the redemptions of the preferred stock of the Champion Rivet Company in the taxable years were made at such times and in such manner as to be the essential equivalents of taxable dividends and that consequently, in accordance with the provisions of section 115 (g) of the Revenue Act of 1928, the amounts paid are taxable as such. The provisions of section 115 (g) of the Revenue Act of 1928 are the same as those of section 201 (g) of the Revenue Act of 1926.
The facts in the case at bar are strikingly like those appearing in Henry B. Babson, 21 B. T. A. 859. As in that case, there is here no suggestion or indication that the issuance of the stock dividend by the Champion Rivet Company in 1922 was a part of a continuing plan to distribute corporate earnings freed from the tax burden of ordinary dividends. The capitalization of surplus accomplished by that method was in complete accord with the company’s purpose to expand its business along legitimate and necessary lines.
*1320 Thus, if the provisions of section 115 (g) are applicable at all to this case, they must relate to the redemptions effected in 1928, 1929, 1930 and 1931. As we said in Annie Watts Hill, 27 B. T. A. 73, “we must also scrutinize the redemption and distribution with respect to the time and the manner when they occur and the circumstances surrounding them at the time.” Henry B. Babson, supra.
Upon examination of the record we find that logically and chronologically the reasons for reducing the company’s capital stock in 1928 and the following years were sound and cogent. Following the recapitalization in 1922 the demand for the company’s product decreased. The development of the electric welding process was materially diminishing the use of rivets. In the spring of that year the company had been forced to reduce the price of its boiler rivets to that of structural rivets, although the production cost of the former remained higher. The contemplated erection of the Pittsburgh plant had been wholly abandoned in 1927. D.ue to the encroachment of electric welding upon the rivet manufacturing industry, the company was compelled to undertake the processing of electric welding rods in order to continue in business. In March, 1930, it sold land adjacent to its Cleveland plant. Thus, by reason of a diminished market, curtailed production, reduced land area (a potential plant facility), and the gradual substitution of electric welding for riveting, the company was confronted with an excess of capital which it found impossible to utilize profitably. Therefore, it proceeded to redeem and cancel portions of its outstanding stock at such times and in such amounts as business exigencies demanded. The diminution of the capital stock of the company was in harmony with the shrinkage of its own business and the lessened market demand for the product which it manufactured.
When we examine the table of dividends declared from 1913 to 1931, inclusive, we are further impressed with the lack of any purpose on the part of the petitioners and their company to distribute corporate earnings by means of an artifice in order to escape the tax. The company was a closely held corporation. From prior to March 1,1913, to January 8,1922, David J. Champion owned approximately one-fourth of its capital stock. From January 8, 1922, to March 14, 1925, he owned almost one-half thereof. Members of his family and intimate business associates owned practically all of the remainder. During the high tax years his company declared large dividends and he and the stockholding associates and members of his family paid their taxes thereon though such dividends had been declared from surplus rather than from operating income. Such a record is not compatible with a studied intent to avoid taxation.
*1321 A further issue is the proper basis for computing profit on the shares of stock of each petitioner upon redemption by the company. The petitioners contend that the profit should be computed according to the “ first-acquired, first-sold ” rule as set forth in articles 58 and 600, Regulations 74. See Towne v. McElligott, 274 Fed. 960; David Stewart, 17 B. T. A. 604. The respondent’s theory is that the shares of stock transferred by David J. Champion on March 14,1925, to D. J. Champion and M. P. Mooney, trustees, are the same shares, or their equivalent under the expanded stock issue, as those inherited by him from his wife, Rose Champion, on January 8, 1922.
The material parts of articles 58 and 600 are as follows:
Abt. 58. Sale of stock and rights. — When shares of stock in a corporation are sold from lots purchased at different dates and at different prices and the identity of the lots can not be determined, the stock sold shall be charged against the earliest purchases of such stock. The excess of the amount realized on the sale over the cost or other basis of the stock will constitute gain. In the case of stock in respect of which any stock dividend was paid, the basis for determining gain or loss from a sale of a share of such stock shall be ascertained in accordance with the principles laid down in article 600.
[[Image here]]
Art. 600. Stock or securities distributed in reorganisation.—
***»*«■*
(4) Where the stock in respect of which a distribution in reorganization is made was purchased at different times and at different prices, and the stock distributed in reorganization can not be identified as having been distributed in respect of any particular lot of such stock, then any sale of the stock distributed in reorganization will be presumed to have been made from the stock distributed in respect of the earliest purchased stock.
The only question, therefore, is whether or not the 1,920 shares of preferred and the 1,920 shares of common stock of the company transferred by David J. Champion on March 14, 1925, to the trustees can be identified as having been distributed to him on December 30, 1922, in respect of the lot of 240 shares acquired by him from his wife’s estate. The evidence before us demonstrates that such identification of the shares is impossible. From prior to March 1, 1913, to January 8, 1922, David J. Champion owned 240 shares of the common stock of the company. On the latter date he acquired 240 additional shares from his wife’s estate. Thus, on December 18, 1922, at the time of the recapitalization, he was the actual owner of 480 shares. On December 30, 1922, pursuant to the order of the board of directors of the company entered on December 27, 1932, he exchanged his 480 shares for 3,840 shares of preferred and 3,840 shares of common stock, representing his original holdings increased by the stock dividend of 8 shares of preferred and 7 shares of common stock for each original share so exchanged. The common stock was issued to David J. Champion in five certificates, three for *1322 1,000 shares each, one for 478 shares and one for 346 shares. The remaining shares were issued to his nominees, P. H. Mooney and W. J. Eeilley, in four certificates, each nominee receiving one certificate for 7 shares and one for one share. The preferred stock was issued to Champion in four certificates, three for 1,000 shares each and one for 824 shares. The remaining shares of that stock were issued to the said nominees in two certificates of 8 shares each.
From this record it is apparent that David J. Champion pooled his original stockholdings, offered them in exchange for the new issue and received certificates for the new stock in amounts that bore no relation to his original stock. It was not until more than two years later that he executed the trust assignment for the benefit of his children. In paragraph 6 of that instrument he sought to indicate the source of the bequest as being the same heritage he had received through his wife’s will. But since his wife’s stock had lost its identity upon the distribution of the stock dividends and the re-issuance of the entire stock interests in the company on December 30, 1922, no descriptive words or acts of his could restore it. The gift to the children was equivalent in number of shares to the bequest from the wife, but they were not the same shares, nor was it possible to effect identification with the original shares.
The values to be used in recomputing the deficiencies are set out in the findings of fact.

Decision will be entered under Rule 50.